UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARC DOUGLAS,

                      Plaintiff,

    v.

CITY OF PEEKSKILL, *et al.*,

                      Defendants.

No. 21-CV-10644 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Arthur G. Larkin, III, Esq.
New York, NY
*Counsel for Plaintiff*

Irma W. Cosgriff, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendants*

John J. Walsh, II, Esq.
Paul E. Svensson, Esq.
Hodges Walsh & Burke LLP
White Plains, NY
*Counsel for Defendants*

James A. Randazzo
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

      Marc Douglas ("Plaintiff") brings this Action, pursuant to 42 U.S.C. § 1983 ("§ 1983")

and New York state law, against the County of Westchester ("County"), City of Peekskill,

Detective Marcos Martinez, Detective Todd Gallaher, Police Officer Christopher Vazeos, Police

Officer Gregory Jones, and John Does 1–10 alleging that prosecutors' failure to disclose *Brady*

material in his criminal case was the result of County policy or custom and that police officers

violated his constitutional rights when he was falsely charged with multiple felonies.  (*See generally* Compl. (Dkt. No. 1).)  Before the Court is the County's Motion To Dismiss the *Monell* claims brought in the Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Dkt. No. 58).)  For the reasons stated herein, the Motion is granted.

## I.  Background

### A.  Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider (1) the Westchester County District Attorney's Office's ("WCDAO") Annual Reports from 2008, 2011, and 2012, (2) the WCDAO Brief in Opposition to Plaintiff's CPL 440 motion, both attached to Plaintiff's Opposition, (3) the Decision and Order of County Court Judge Barbara Zambelli dated September 8, 2017, (4) the Decision and Order of Judge David S. Zuckerman, dated May 12, 2020, or (5) the Affirmation of Assistant District Attorney Steven A. Bender Consenting to Vacate Conviction and Dismiss Indictment dated December 18, 2020, attached to the County's Motion to Dismiss at this stage of the litigation.

### 1.  Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted).  However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment."  *Id*. (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling

on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety. . .,
documents incorporated into the complaint by reference, and matters of which a court may take
judicial notice") (quotation marks omitted); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir.
2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and
matters of which judicial notice may be taken.'") (alteration omitted) (quoting *Samuels v. Air
Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993)).  Under the Federal Rules of Evidence, a court
may take judicial notice of a fact outside of the pleadings provided that the fact "can be
accurately and readily determined from sources whose accuracy cannot reasonably be
questioned."  Fed. R. Evid. 201(b).

  2.  Application

  "[C]ourts routinely take judicial notice of documents filed in other courts . . .  to
establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc*., 937 F.2d
767, 774 (2d Cir. 1991); *see also Casey v. Odwalla, Inc.,* 338 F. Supp. 3d 284, 294 (S.D.N.Y.
2018) ("[C]ourts may take judicial notice of public documents and matters of public record.");
*O'Neal v. East Hampton Town*, No. 16-CV-579, 2017 WL 4174788, *1 n.2. (E.D.N.Y. Aug. 28,
2017) ("Judicial notice may be taken of the state court documentation submitted by defendants.")
(collecting cases), *adopted sub nom. O'Neal v. Spota*, 2017 WL 4162307 (E.D.N.Y. Sept. 19,
2017).  However, "in taking judicial notice of such public records, the Court does so only to
establish the fact of such litigation, not for the truth of the matters asserted in that proceeding."
*Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *7 (S.D.N.Y. Sept. 29, 2018)
(quotation marks and citations omitted); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir.
2007) ("If the court takes judicial notice, it does so in order to determine what statements [a

document] contained—but again not for the truth of the matters asserted.") (quotation marks and emphases omitted).  Accordingly, this Court takes judicial notice of the relevant state court briefs, affirmations, and decisions attached by both Plaintiff and County Defendant in their respective motions: the WCDAO Brief in Opposition to CPL 440 motion, the Decision and Order of County Court Judge Barbara Zambelli dated September 8, 2017, the Decision and Order of Judge David S. Zuckerman, dated May 12, 2020, and the Affirmation of Assistant District Attorney Steven A. Bender Consenting to Vacate Conviction and Dismiss Indictment dated December 18, 2020.  *See Sheindlin v. Brady*, No. 21-CV-1124, 2022 WL 1063678, at \*2 n.1 (S.D.N.Y. Apr. 7, 2022) (considering filings in prior legal proceedings); *Hutchins*, 2018 WL 4757970, at \*7 (same).

Additionally, it is "clearly proper to take judicial notice" of "documents retrieved from official government websites."  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); *see also Leger v. Kalitta*, No. 16-CV-6545, 2018 WL 2057142, at \*3 (E.D.N.Y. Jan. 26, 2018) ("[T]he Court may take judicial notice of documents retrieved from official government websites or other government records from such websites.") (quotation marks omitted).  Accordingly, this Court takes judicial notice of the WCDAO Annual Reports from 2008, 2011, and 2012, available on the Westchester County Office of the District Attorney's website.  *See e.g., Jones v. Cuomo*, 542 F. Supp. 3d 207, 211 n.1 (S.D.N.Y.  2021) (taking judicial notice of documents retrieved from official government websites); *Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 412 (S.D.N.Y. 2021) (same).[1]

_____

[1] The County Defendant also attaches a Release from Plaintiff to the Westchester County Attorney for records in Plaintiff's criminal case pursuant to New York State Criminal Procedure Law Section 160.50 dated December 21, 2021.  (Cosgriff Decl. Ex. B.)  This release is not referenced in either of the County's Motion to Dismiss or Reply and the Court sees no reason to take judicial notice of it.

4

B.  Factual Background

    1.  Plaintiff's Particular Incident

The Court restates, assumed to be true, the facts alleged in the Complaint relevant to the instant Motion.  Plaintiff Marc Douglas is a 38-year-old man who resides in the Bronx.  (Compl. ¶ 4.)  In March 2007, Plaintiff was convicted of burglary in the first degree, assault, and two Class A misdemeanors after a jury trial for entering Jerry Newton's ("Newton") apartment and shooting him in the leg.  (*Id*. ¶¶ 106, 132.)

On February 25, 2006, Newton had been assaulted by two men wearing hoodies and ski masks.  (*Id*. ¶ 21.)  Newton was taken from the scene in an ambulance and treated at Westchester County Medical Center ("WCMC"), during which he denied knowledge of the identity of his attackers.  (*Id*. ¶¶ 31, 33.)  At WCMC, Peekskill police officers informed Newton that ecstasy pills and crack cocaine had been recovered from the scene, and after being threatened with "serious criminal charges regarding the drugs," he identified Plaintiff as one of the men who assaulted him.  (*Id*. ¶¶ 33–39.)  According to Plaintiff, Newton "stated [] falsely, that he only got crack from [Plaintiff] and no other source" and still owed him money from a drug sale.  (*Id.* ¶¶ 36, 38.)  Newton claimed that he recognized Plaintiff's voice when the attacker said, "Where's my shit?"  (*Id.* ¶ 37.)  Plaintiff was arrested later that day.  (*Id.* ¶ 41.)

In April 2006, Newton sold cocaine to a confidential informant on four separate occasions.  (*Id*. ¶¶ 70–71.)  At that time, Newton was operating out of his sister Yolanda Newton's ("Yolanda") apartment.  (*Id*.)  On May 2, 2006, based on these sales, Westchester County police executed a search warrant at Yolanda's apartment and confiscated drugs, paraphernalia, and a revolver.  (*Id*. ¶ 72.)  Yolanda was arrested and charged with drug and gun

possession.  (*Id.* ¶ 73.)  Four months later, on September 17, 2006, Newton was arrested in Putnam County and charged with drug possession.  (*Id.* ¶ 74.)

In October 2006, Newton's attorney in the Putnam case reached out to the WCDAO to see what it would offer if Newton admitted to ownership of the gun found at Yolanda's apartment.  (*Id.* ¶ 76.)  Senior ADA Patrick Moore ("ADA Moore") responded that it would allow Newton to plead guilty to criminal possession of a weapon in the third degree and recommend a sentence of one year in the County jail, and that it would also dismiss the gun charges against Yolanda.  (*Id.* ¶¶ 77–79).

In January 2007, Newton's counsel signed a plea offer letter from the Putnam DA to resolve the Putnam County drug charges: Newton would plead guilty to criminal possession of a controlled substance in the fifth degree ("CPCS-5th degree"), in exchange for a recommended sentence of one and one-half years in State prison.  (*Id.* ¶¶ 80–81.)  But when the Putnam case was next on the calendar, the court adjourned the matter based on Newton's counsel's representation that he was trying to work out a "joint disposition" of all pending charges with ADA Moore of the WCDAO.  (*Id.* ¶¶ 82-83.)  At the next court appearance, on March 14, 2007, the case was adjourned again because Newton was scheduled to testify against Plaintiff the following week.  (*Id.* ¶ 84.)

While Newton's counsel was trying to work out the "joint disposition" of both cases with ADA Moore, Newton told ADA Timothy Ward ("ADA Ward")—the ADA trying Plaintiff's case—that "he did not want to testify against [Plaintiff]."  (*Id.* ¶ 86.)  ADA Ward subsequently obtained a material witness warrant for Newton after which he was arrested and taken into custody.  (*Id.* ¶ 87.)

ADA Ward told Newton that "he, or his office, would speak to the Putnam County District Attorney and put in a good word for him, if he would agree to testify at [Plaintiff's] trial consistent with his prior statement identifying [Plaintiff] as the assailant."  (*Id*. ¶ 88.)  Ultimately, Newton testified and identified Plaintiff as the assailant at trial.  (*Id*. ¶ 90.)  At trial, ADA Ward argued to the jury that "the assailant's purported statement—'Where's my shit?'  — was self-identifying and proved that [Plaintiff] had to be the attacker" because Newton did not obtain drugs from any source other than Plaintiff.  (*Id*. ¶¶ 100, 102.)

Instead of serving one and a half years in state prison on the Putnam case, Newton pled guilty to CPCS-5th degree and was sentenced to one year in county jail "at the specific request of Westchester County ADA Moore, as ADA Moore acknowledged in a letter to the Putnam County DA's office after [Plaintiff's] trial."  (*Id*. ¶ 91.)  Newton also pled guilty to gun possession in exchange for a one-year sentence in Westchester County Jail and the gun charges against Yolanda were dropped.  (*Id*. ¶ 92.)

Plaintiff alleges the WCDAO withheld material facts from Plaintiff's defense counsel. First, the Plaintiff alleges that WCDAO failed to disclose that Newton sold drugs on four occasions to a confidential informant and could have been charged with multiple felony drug sales.  (*Id*. ¶¶ 70-71, 103.)  Plaintiff alleges this information was exculpatory because it showed that Newton "had ready access to crack, as evidenced by the fact that he was arrested barely six weeks after the crime for selling drugs which he obviously obtained from sources other than [Plaintiff]," indicating the assailant who said "where's my shit" could have been someone other than Plaintiff.  (*Id*. ¶ 102.)

Second, Plaintiff alleges ADA Ward withheld "the significant benefits his office had conferred on Newton—lenient treatment on the gun charge; intervention in the Putnam case to

secure a more lenient sentence on Newton's drug charges than his counsel had previously agreed to accept, viz., one year in the Putnam County jail instead of one and one-half years in State prison; and finally, an extremely lenient 90-day sentence for the drug possession charges based on the crack and ecstasy pills found" in the apartment when Newton was attacked, which "ran concurrently to the lenient sentence on the drug charge." (*Id.* ¶ 104.) The benefits that Newton's plea deal conferred to Yolanda were also not disclosed to the defense. (*Id.* ¶ 105.)

In June 2019, Plaintiff filed a Criminal Procedure Law 440 motion to set aside his conviction based on Newton's recantation of his identification of Plaintiff and "substantial documentary evidence showing that Newton had received significant benefits on his open cases, and that none of these benefits were disclosed to the defense before trial." (*Id.* ¶¶ 111–17.) The WCDAO opposed the motion and denied "in strong language that the office had made any deals with Newton." (*Id.* ¶ 115.) The court granted Plaintiff a hearing on that motion. (*Id.* ¶ 116.) Ultimately, the WCDAO "conducted its own independent investigation into the case" and consented to vacate Plaintiff's conviction. (*Id.* ¶¶ 118–123.) Plaintiff was released from prison in December 2020. (*Id.* ¶ 126.)

### 2. Westchester County Practices

Plaintiff alleges that "[p]rior to, during and following the prosecution of [him], the County of Westchester, through its policymakers the elected District Attorneys of that County, exhibited deliberate indifference to the office's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, which directly and proximately caused the violations of [P]laintiff's rights." (*Id.* ¶ 171.)

Plaintiff alleges that "until 2020, the Westchester County District Attorney's Office [ ] had no system in place to ensure accurate, timely sharing of information regarding uncharged

criminal activity by witnesses, or potential deals with witnesses, who testified for the People in criminal cases." (*Id*. ¶ 172.)  Plaintiff also alleges that "[s]uch information-sharing was a low priority, or no priority whatsoever, within the office at the time." (*Id*. ¶ 177.)  Furthermore, Plaintiff alleges that "[t]he need for such systems is obvious, especially since the WCDAO has a policy of not formally charging persons with crimes when the evidence against the defendant includes testimony by a confidential informant and since there are approximately forty (40) separate, local police agencies that regularly investigate crimes within the County." (*Id*. ¶ 174.) The failure to "institute appropriate policies, procedures and practices to ensure information-sharing within the office created a substantial risk that *Brady* material would not be disclosed to defense attorneys." (*Id*. ¶ 175.)  "The WCDAO's deliberate indifference proximately caused harm in [Plaintiff's] case because WCDAO policy did not require ADA Moore, or any other involved ADA[]s or law enforcement officials, to share with ADA Ward the plea offers made to [] Newton or other benefits conferred on [] Newton, or Newton's uncharged criminal activity of which the WCDAO was, or should have been, aware." (*Id.* ¶ 176.)

Plaintiff additionally alleges that the County had a "*de facto* custom and practice . . . of suppressing *Brady* information including tacit deals with witnesses." (*Id.* ¶ 2.)  Plaintiff claims that the "WCDAO also had a policy of aggressively defending its conduct even when *Brady* violations were obvious." (*Id.* ¶ 193.)  Before Plaintiff's trial, for example, "the WCDAO committed numerous *Brady* violations in felony trials, and in each case defended its conduct despite the obvious nature of the violation." (*Id.* ¶ 201.)  Plaintiff cites to eight cases from 1987 to 2015 where the WCDAO allegedly failed to disclose *Brady* material in some regard: *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006); *People v. Days*, 15 N.Y.S.3d 823 (App. Div. 2015); *People v. Hairston,* 958 N.Y.S.2d 647 (Sup. Ct. 2011); *People v. Stein*, 781 N.Y.S.2d

654, 655 (App. Div. 2004); *People v. Rodriguez*, 722 N.Y.S.2d 257 (App. Div. 2001); *People v. Makrinos*, 641 N.Y.S.2d 321 (App. Div. 1996); *People v. Dunn*, 540 N.Y.S.2d 725 (App. Div. 1989); *People v. Smith,* 512 N.Y.S.2d 244 (App. Div. 1987).  (*Id.* ¶¶ 194–206.)  Plaintiff also alleges that the WCDAO "issues annual reports that highlight its purported conviction rate and compare its rate favorably to other district attorneys' offices around the State."  (*Id*. ¶ 199.)

Plaintiff additionally alleges that "[a]t the time of [his] case, the WCDAO was on notice that its assistants did not understand the *Brady* rule adequately to protect the rights of persons accused of crimes."  (*Id*. ¶ 179.)  Plaintiff points to *DiSimone v. Phillips*, a Second Circuit decision issued on August 22, 2006, holding that the WCDAO's position that "there may be situations in which a prosecutor, in his discretion, may fairly keep to himself knowledge of available testimony which he views as mistaken or false" was "wholly without merit."  (*Id*. ¶¶ 180–184.)  After remand, the WCDAO disclosed *Brady* material that it "acknowledged, [] should have been disclosed prior to the defendant's trial."  (*Id*. ¶ 186.)  "In a written opinion filed on February 5, 2007, just one month before [Plaintiff's] trial, the district court noted the WCDAO's concession that the office had violated its *Brady* obligations, and described those violations as 'to say the least, egregious.'"  (*Id*. ¶ 187 (citation omitted).)  Plaintiff alleges that "[w]hile the WCDAO remedied the *Brady* violations in the *DiSimone* case, the District Attorney at the time did not undertake any further steps whatsoever to ensure that all assistants understood *Brady* adequately, or to ensure that all required *Brady* material in all cases was disclosed to defense counsel in a timely manner."  (*Id*. ¶ 189.)

Finally, Plaintiff alleges that ADA Steven Bender ("ADA Bender")—who was a supervising ADA at the time of Plaintiff's trial and the ADA in *DiSimone*—"has been promoted

10

within the office since the *DiSimone* case, and by promoting him, the WCDAO has ratified his 'egregious' *Brady* violations."  (*Id.* ¶¶ 191–192.)

### C.  Procedural History

Plaintiff filed his Complaint on December 13, 2021.  (Dkt. No. 1.)  County Defendant filed the instant Motion on March 17, 2022.  (*See* Not. of Mot. (Dkt. No. 41); Mem. of Law in Supp. of Mot. ("Def.'s Mem") (Dkt. No. 44).)  Plaintiff filed his Opposition on May 13, 2022. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pl.'s Mem.") (Dkt. No. 50).)  Finally, County Defendant filed a Reply on June 23, 2022.  (*See* Reply to Mot. ("Def.'s Reply Mem.") (Dkt. No. 58).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S.  544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*  (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed."  *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, as noted, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. *Monell* Claim Analysis

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013). However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *see also Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of N.Y.*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy or custom") (quotation marks omitted); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983

"by application of the doctrine of respondeat superior." (italics omitted)); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

  "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'"  *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003).  Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]."  *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("Plaintiff fails to allege the existence of any other similar incident, which dooms Plaintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality.") (citation and quotation marks omitted); *Santana v. City of N.Y.,* No. 15-CV-6715, 2018 WL

1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.'" (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also Patterson v. Cty. of Oneida*, *N.Y.*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).  Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation.  There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of*

*N.Y.,* 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff "fails to state a *Monell*

claim" because the plaintiff "has not pled facts demonstrating a direct link between his injuries

and the alleged municipal policy"); *Johnson v. City of N.Y.*, No. 06-CV-9426, 2011 WL 666161,

at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal

policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between

the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

      The County does not contest that Plaintiff has alleged facts tending to support the alleged

underlying constitutional violations.  (*See generally* Def.'s Mem.)  Instead, the County moves to

dismiss Plaintiff's *Monell* claims on the basis that Plaintiff has not plausibly alleged that the

County (1) had a widespread custom and practice of violating *Brady* and (2) failed to provide

adequate training or supervision to subordinates to such an extent that it amounts to deliberate

indifference.  *Id*.  Accordingly, this Court will consider the County's challenges to the *Monell*

claim and will not undertake an analysis of the underlying constitutional violations.

      Plaintiff does not allege that the County maintains a formal policy officially endorsed by

the municipality—instead he argues that the County had a "*de facto* custom and practice . . . of

suppressing *Brady* information including tacit deals with witnesses." (Compl. ¶ 2.)[2]  Plaintiff

---

[2] Plaintiff argues that the "failure to institute appropriate policies, procedures and
practices to ensure information-sharing in the office created a substantial risk that *Brady* material
would not be disclosed to defense attorneys."  (Compl. ¶ 175.)  Furthermore, he claims that
because "WCDAO policy did not require ADA Moore, or any other involved ADA's or law
enforcement officials to share with ADA Ward the plea offers made to Jerry Newton or other
benefits conferred on [] Newton, or Newton's uncharged criminal activity of which the WCDAO
was, or should have been, aware" the WCDAO's "deliberate indifference proximately caused
harm in [Plaintiff's] case."  (*Id*. ¶ 176.)  However, an alleged absence of a formal policy is not a
policy: "the absence of a policy is not a policy and is not actionable under *Monell*."  *Zachary v.
City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing
*Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL
5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put
a formal policy in place to prevent unlawful conduct is not the same thing as an actionable

makes three arguments in support of County liability under *Monell*.  First, he argues that "at the time of [his] trial the WCDAO had no system for information sharing to ensure that uncharged criminal conduct by witnesses, or potential plea deals with those witnesses, was circulated within the office so that all required *Brady* disclosures would be made in criminal cases."  (Pl.'s Mem. 7.)  Second, Plaintiff argues that the WCDAO "was on notice at the time of [Plaintiff's] trial that its assistants fundamentally misunderstood the *Brady* rule, yet the office took no action to address this problem."  (*Id*. at 8.)  Third, Plaintiff argues that "as further evidence of the WCDAO's deliberate indifference, from 1987 [to] 2011, the office fiercely defended its conduct when challenged on *Brady* and other, similar constitutional issues, even when the violations were obvious."  (*Id*. at 10.)

Of note, Plaintiff does not allege any actions taken by government officials responsible for establishing the municipal policies caused the injury in question.  Accordingly, the Court need only analyze whether Plaintiff has plausibly alleged that there existed a sufficiently widespread practice to constitute a custom, or whether policymakers failed to provide adequate

---

policy."), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020).  "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act."  *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where . . . a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")).  When a municipality "does not have an adequate policy . . . *Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192).  "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*."  *Id*.

training or supervision so grossly that it rises to gross indifference.  *See Atadzhanov*, 2022 WL 4331304, at *11 (listing the four modes of proving a policy, custom, or practice under *Monell*).

### 1.  Widespread Practice

To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions."  *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)).  A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials."  *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (citing *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870–71 (2d Cir. 1992); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

Plaintiff's Complaint cites to eight cases between 1987 and 2015, where the WCDAO failed, in some respect, to turn over *Brady* material, presumably alleging the cases constitute a widespread practice of violating *Brady*: *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006); *People v. Days*, 15 N.Y.S.3d 823 (App. Div. 2015); *People v. Hairston,* 958 N.Y.S.2d 647 (Sup. Ct. 2011); *People v. Stein*, 781 N.Y.S.2d 654, 655 (App. Div. 2004); *People v. Rodriguez*, 722 N.Y.S.2d 257 (App. Div. 2001); *People v. Makrinos*, 641 N.Y.S.2d 321 (App. Div. 1996); *People v. Dunn*, 540 N.Y.S.2d 725 (App. Div. 1989); *People v. Smith,* 512 N.Y.S.2d 244 (App.

Div. 1987).  Plaintiff does not specifically allege in the Complaint that these cases establish a

widespread practice upon which *Monell* liability arises.  Furthermore, Plaintiff in his Opposition

does not respond to the County's argument in its Motion to Dismiss that these cases do not

establish a widespread practice.  (*See generally* Pl.'s Mem.)  However, this Court will

nonetheless undertake an analysis of the cited cases to determine whether they sufficiently allege

a widespread practice such that the WCDAO was faced with a widespread pattern of *Brady*

violations it aggressively defended.

 To start, two of the eight cited cases post-date Plaintiff's 2007 conviction.  A Plaintiff

cannot point to "contemporaneous or subsequent" violations to "establish a pattern of violations

that would provide notice to the cit[y] and the opportunity to conform to constitutional dictates."

*Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011) (alteration in original) (quotation marks and

citation omitted).  Additionally, *People v. Rodriguez* involves a late *Brady* disclosure, not a

*Brady* violation, where material was turned over before opening statements and the defendant

was able to use the material as evidence at trial.  *See Rodriguez*, 722 N.Y.S.2d at 258.  Therefore,

in the 20 years prior to Plaintiff's trial, Plaintiff can point to five *Brady* violations—six including

his own.

 "Pleadings articulating only isolated instances of unconstitutional behavior do not

plausibly allege a well-settled custom."  *Pettiford v. City of Yonkers*, No. 14-CV-6271, 2021 WL

2556172, at *12 (S.D.N.Y. June 21, 2021).  Here, Plaintiff has only pled isolated instances of

*Brady* violations over the course of 20 years, which do not plausibly allege a widespread custom.

*See Buari*, 530 F. Supp. 3d at 406 (finding no widespread custom when plaintiff cites to 23 cases

"from 1982 to 2002, a twenty-year period [and therefore] alleges only slightly more than one

case of similar prosecutorial misconduct each year"); *White v. City of N.Y.*, 206 F. Supp. 3d 920,

938 (S.D.N.Y. 2016) (holding six incidents over five years insufficient to plausibly allege the existence of a municipal policy); *Nunez v. City of N.Y.*, No. 14-CV-4182, 2016 WL 1322448, at *9 (S.D.N.Y. Mar. 31, 2016), (holding that a "[p]laintiff's identification of approximately two unfavorable decisions per year over a twenty-three-year period fails to support a reasonable inference of a practice . . . so consistent and widespread that it constitutes a custom" (quotation marks and citation omitted)), *aff'd*, 735 F. App'x 756 (2d Cir. 2018); *Jovanovic v. City of N.Y.*, No. 04-CV-8437, 2010 WL 8500283, at *15 (S.D.N.Y. Sept. 28, 2010) (holding that the plaintiff failed to allege "that the District Attorney's Office had an improper policy or custom" by merely pointing to other cases involving alleged prosecutorial misconduct because in light of the "myriad convictions" that the DA's Office "obtained" in the 1990s, the "small number of cases" cited by Plaintiff was "insufficient to establish that the DA's Office was on notice of its allegedly deficient training or that these deficiencies [were] the result of deliberate indifference"), *aff'd*, 486 F. App'x 149 (2d Cir. 2012); *cf. Newson v. City of N.Y.*, No. 16-CV-6773, 2019 WL 3997466, at *8 (E.D.N.Y. Aug. 23, 2019) ("Importantly, Plaintiff cites 87 cases of prosecutorial misconduct by the [Queens County District Attorney] between 1985 and 2004, including 28 cases in which the [Queens County District Attorney's Office] withheld *Brady* or *Rosario* material"—which sufficiently alleged a pattern and practice of which municipal policymakers "must have been aware").

Furthermore, the cases Plaintiff cites in support of his position are inapposite.  First, in *Newton v. City of New York*, 779 F.3d 140 (2d Cir. 2015), the Second Circuit held that the district court should have upheld a jury's *Monell* verdict against a city when a plaintiff showed that the city's "poor administration of its evidence management system," which had a "unconstitutionally deleterious effect on case closings in a large number of cases . . .

perpetuat[ing] a practice or custom that was wholly inadequate." *Id*. at 155.  However, unlike in

*Newton*, Plaintiff here has not shown that the WCDAO was faced with a pattern of misconduct,

compelling the conclusion that its failure to institute an information sharing system constitutes

tacit authorization of the unlawful actions.

    Second, *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019) also does not support

Plaintiff's claim.  In *Bellamy*, the Second Circuit vacated the district court's dismissal of *Monell*

claims "based upon allegations that, *pursuant to a policy*," the Queens County District

Attorney's Office violated *Brady*. *Id*. at 742 (emphasis added).  In that case, prosecutors

withheld the "full benefits received by witnesses in its witness protection program," because of a

"deliberate information barrier imposed by the [office] that purposefully kept prosecutors

unaware of the full benefits." *Id*. at 756.  Unlike in *Bellamy,* Plaintiff here has not alleged that

the constitutional violation is the result of a formal policy, therefore *Bellamy* is not instructive.

    In sum, the Court concludes that Plaintiff has not plausibly stated a *Monell* claim under a

theory of widespread custom or practice.

### 2.   Failure to Train

    *Monell* liability can also exist "'where a local government is faced with a pattern of

misconduct and does nothing, compelling the conclusion that the local government has

acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Fraser v. City of N.Y.*,

No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506

F.3d at 192).  One category of municipal acquiescence involves a failure to train public officials.

However, a failure to train constitutes a policy or custom that is actionable under § 1983 only

where "in light of the duties assigned to specific officers or employees[,] the need for more or

different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (citing *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

To set forth a failure to train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015). Here, Plaintiff's claim fails first and foremost because he has not alleged a specific deficiency in the WCDAO's training. Plaintiff only alleges in his Complaint that "[w]hile the WCDAO remedied the *Brady* violations in the *DiSimone* case, the District Attorney at the time did not undertake any further steps whatsoever to ensure that all assistants understood *Brady* adequately, or to ensure that all required *Brady* material in all cases was disclosed to defense counsel in a timely manner." (Compl. ¶ 189.) In his Opposition, Plaintiff similarly claims that in the wake of the *DiSimone* decision "the district attorney took no action whatsoever to ensure that her assistants understood that it was not their prerogative to decide whether evidence was sufficiently credible to constitute *Brady* material." (Pl.'s Mem. 21.) Plaintiff's broad allegations do not identify specific training deficiencies relating to the

particular type of *Brady* evidence at issue here.  *See Connick*, 563 U.S. at 67 (holding that a plaintiff "must assert that prosecutors were not trained about particular *Brady* materials or the specific scenario related to the violation in his case" to state a failure to train claim).

Accordingly, the failure to train claim is dismissed.  *See Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at *12 (S.D.N.Y. Sept. 22, 2022) (dismissing *Monell* claim where plaintiff failed to "allege a specific deficiency in either the [c]ity or the [c]ounty's training for his failure-to-train theory"); *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at *11 (S.D.N.Y. Nov. 21, 2016) (dismissing failure to train claim when a "[p]laintiff's allegations regarding a supposed lack of training are too general and speculative to support a *Monell* claim"); *Triano*, 895 F. Supp. 2d at 539–40 (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Walker v. City of N.Y.*, No. 14-CV-808, 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (dismissing failure to train claim where the plaintiff "neither cites to procedural manuals and training guides, nor highlights the pertinent aspects of police training in order to prove the claim").

Furthermore, once a plaintiff identifies a specific deficiency, that plaintiff must "establish that that deficiency caused the constitutional deprivation."  *Benn v. City of N.Y.*, No. 18-CV-722, 2021 WL 3193022, at *6 (S.D.N.Y. July 28, 2021) (citation omitted).  Plaintiff does not allege a training deficiency caused the *Brady* violation.  Instead, Plaintiff only asserts that after *DiSimone,* "the District Attorney at the time did not undertake any further steps whatsoever to ensure that all assistants understood *Brady* adequately."  (Compl. ¶ 189.)  Without asserting a specific training deficiency was the cause of Plaintiff's constitutional deprivation, Plaintiff does not plausibly allege that a deficiency in training caused his injury, thus independently dooming

this claim.  *See King v. City of Beacon Police Dep't*, No. 20-CV-5815, 2021 WL 1550073, at *3 (S.D.N.Y. Apr. 20, 2021) (dismissing *Monell* claims when plaintiff did not sufficiently allege that his injuries "resulted from a municipal policy or custom"); *Acosta v. City of N.Y.*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused .  .  .  [the] alleged violations of [the] plaintiff's rights").

Beyond these concerns, the Supreme Court has emphasized that, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 563 U.S. at 62 (citation and quotation marks omitted).  This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id*.  This is particularly true of prosecutors: "[a] district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in 'the usual and recurring situations with which [the prosecutors] must deal.'"  *Connick*, 563 U.S. at 67 (alteration in original) (citing *Canton,* 489 U.S. at 391).

Plaintiff first cites to *DiSimone v. Phillips.*  (Compl. ¶¶ 180–93.)  In that case, which was decided seven months before the start of Plaintiff's trial, the WCDAO failed to timely disclose a witness's affidavit indicating that another individual had confessed to stabbing the murder victim.  *DiSimone*, 461 F.3d at 195–97.  The WCDAO took the position that the evidence was not *Brady* material because "it was inculpatory as well as exculpatory" and that a prosecutor

"may fairly keep to himself knowledge of available testimony which he views as mistaken or false." *Id.* at 194.  (*See also* Compl. ¶ 182.)  The Second Circuit rejected this position as "wholly without merit."  *DiSimone*, 461 F.3d at 195.

Plaintiff cites to an additional seven cases between 1987 and 2015, presumably alleging the cases constitute a pattern of similar *Brady* violation sufficient to support his claim.[3]  To constitute a pattern in the *Brady* failure to train context, courts look to whether the previous *Brady* violations are sufficiently similar to the violation in the case before it.  *Connick*, 563 U.S. at 63 (requiring prior *Brady* violations to be "similar to the violation at issue" to put a prosecutor's office "on notice that specific training was necessary to avoid this constitutional violation"); *see also Greene v. City of N.Y.*, 742 F. App'x 532, 536–37 (2d Cir. 2018) (summary order) (noting that to constitute a pattern, prior *Brady* violations must "concern the nondisclosure of the same sort of evidence at issue"); *Jones v. City of N.Y.*, 988 F. Supp. 2d 305, 313 (E.D.N.Y. 2013) (requiring prior *Brady* violations to establish that "the training program was inadequate with respect to the kind of DNA *Brady* evidence" withheld in the instant case).  Accordingly, a closer examination of the cases cited by Plaintiff is required.

As mentioned above, two of the eight cases Plaintiff cites to were decided *after* Plaintiff's trial.  A plaintiff cannot point to "contemporaneous or subsequent" violations to "establish a pattern of violations that . . . provide[d] notice to the cit[y] [that it needed] . . . [t]o conform [its training or supervising program] to constitutional dictates."  *Connick*, 563 U.S. at 63 n.7

---

[3] Plaintiff's Opposition does not respond to the County Defendant's argument that these cases do not constitute a pattern.  Instead, Plaintiff's Opposition only argues that the *DiSimone* case constitutes a "specific reason" for the District Attorney to be on notice that the office's *Brady* training was insufficient.  (Pl.'s Mem 21–22.)  However, for the sake of completeness, this Court addresses the possibility that the cases listed in Plaintiff's Complaint could constitute a pattern under failure to train.

(second alteration in original) (quotation marks omitted); *see also Greene*, 742 F. App'x at 536–37 (noting that decisions that were issued after a plaintiff's trial could not provide notice to the district attorney's office that it needed to alter its trainings).

The six cases Plaintiff cites between 1987 and 2006 involve nondisclosure of different types of evidence.  In *DiSimone*, the court found the WCDAO had failed to disclose a confession.  *See DiSimone*, 461 F.3d at 195–98.  In *People v. Stein*, the court found that the WCDAO had failed to disclose that two complaining witnesses had filed notices of claim which were "highly relevant to the issue of their credibility."  781 N.Y.S.2d at 655.  In *People v. Makrinos*, the court held that the WCDAO's failure to turn over pre-trial disclosure of any written report or document concerning an intoxilyzer test to the defendant was in violation of *Brady*, but that the error was harmless.  *Makrinos*, 641 N.Y.S.2d at 322.  In *People v. Smith*, the court noted that the WCDAO's withholding of information that a "police officer had engaged in acts of official misconduct aimed at influencing the police investigation to focus upon the defendant" amounted to a *Brady* violation.  512 N.Y.S.2d at 245.  Finally, in *Rodriguez* and *Dunn,* the type of non-disclosure was not discussed, rendering these cases unhelpful to Plaintiff. *See Rodriguez*, 722 N.Y.S.2d at 258 (involving a late *Brady* disclosure where material was turned over before opening statements and defendant was able to use material as evidence at trial and the WCDAO was sanctioned); *Dunn*, 540 N.Y.S.2d at 725–26 (involving the failure to disclose information obtained during trial that defense counsel learned independently).  Because the cases Plaintiff cites to involve different types of *Brady* violations—none of which involve failures to disclose deals between prosecutors and witnesses or a witness's criminal history—they do not constitute a pattern sufficient to allege a failure to train.  *See Connick*, 563 U.S. at 62-63 (finding four prior violations insufficiently "similar to the violation at issue" to "have put

[the city] on notice that specific training was necessary" because none "involved [the] failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind"); *see also Greene*, 742 F. App'x 536–37 (finding two prior violations that did not "concern the nondisclosure of the same sort of evidence at issue"—"an alleged deal between the [prosecutor] and a potential witness intended to induce his testimony; an audiotape of an interview with a witness; and notebooks containing detectives' notes from interviews with witnesses" did not constitute a pattern); *Jones*, 988 F. Supp. 2d at 313 ("Although [the] plaintiff's amended complaint includes an impressive recitation of past . . . claims against the [District Attorney's Office], none deal with the specific type of [evidence] at issue here—ambiguous DNA evidence.").

Plaintiff, however, argues that the decision in *DiSimone* alone provided "specific reason" for the District Attorney to be on notice that the office's *Brady* training was insufficient without a pattern of similar violations. (Pl.'s Mem. 21.) Plaintiff relies exclusively on *Connick* in arguing that the *DiSimone* decision alone constituted a "specific reason" that the WCDAO had notice that the office's *Brady* training was insufficient. (*Id*. at 19–21.) He contends that the WCDAO's position "misapprehends the very underpinnings of *Brady*" and that "the pleaded facts support the inference that the Districts Attorney's misguided arguments were approved by the chief of the appeals unit—the one attorney in the WCDAO who would be expected to understand the requirements of *Brady* and other constitutional dictates." (*Id*. at 22.)

Plaintiff also points out that in *Connick*, the Supreme Court acknowledged that *Brady* "has gray areas," and to prove deliberate indifference, a plaintiff must show that the district attorney "was on notice that, absent additional specified training, it was highly predictable that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady*

decisions as a result." *Connick*, 563 U.S. at 71 (quotation marks omitted).  Plaintiff argues that the facts of *DiSimone* "support the inference that trial assistants in the WCDAO were 'confounded' by the gray areas of *Brady*, as that office's appeals unit advanced arguments before the Second Circuit plainly, obviously contrary to that decision's holding and purpose."  (Pl.'s Mem. 22.)

The Supreme Court in *Connick* did not expound on what might constitute a "specific reason" a district attorney would have notice that *Brady* trainings were insufficient beyond a pattern of violations.  In a footnote, the Supreme Court noted that a "prosecutor's youth is not a specific reason not to rely on professional training and ethical obligations."  *Connick*, 563 U.S. at 67 n.9 (citation and quotation marks omitted).[4]  However, beyond this clarification, the Supreme Court provided no other examples.  Furthermore, this Court has not found any cases expounding on this "specific reason" exception.  In the absence of explicit precedential guidance, this Court undertakes an analysis of *Connick* to ascertain whether the *DiSimone* decision could constitute a "specific reason" for the WCDAO to be on notice that its *Brady* training was insufficient.

The *Connick* Court was careful to specify that notice that an office's *Brady* training was inadequate requires showing that "the policymaker for the district attorney's office[] was deliberately indifferent to the need to train the prosecutors about their *Brady* disclosure obligation with respect to evidence *of this type*"—namely, the type of evidence not disclosed in a plaintiff's case.  *Id.* at 59 (emphasis added).  The Court again specified the need for notice to be specific to the type of nondisclosed evidence at issue, stating that because the evidenced prior

---

[4] In *Connick*, the Supreme Court overturned the Fifth Circuit's decision that the district attorney "was on notice of an obvious need for *Brady* training" because "attorneys, often fresh out of law school, would undoubtedly be required to confront *Brady* issues while at the DA's Office." *Connick*, 563 U.S. at 58.

*Brady* "incidents are *not similar to the violation at issue here*, they could not have put Connick on notice that specific training was necessary to avoid *this* constitutional violation."  *Id*. at 63 (emphasis added).  It follows that any "specific reason" a District Attorney was on notice that its line attorneys were "confounded by a gray area" must be specific to the type of *Brady* violation at issue before a court.  Therefore, Plaintiff's allegations that the *DiSimone* decision put the district attorney on notice that WCDAO attorneys were confounded by the gray areas of *Brady* is insufficient.  Plaintiff must show the *DiSimone* case put the district attorney on notice that line attorneys were confounded by a gray area of *Brady* that is at issue in this case.  The evidence at issue in *DiSimone* was a confession—evidence that prosecutors believed was mistaken or false— here the evidence at issue involves a deal between prosecutors and a witness and a witness's criminal history.  Because the *DiSimone* decision did not provide notice that line attorneys were confounded by the type of *Brady* disclosure at issue here, it does not qualify as a "specific reason" the district attorney should have been on notice that the *Brady* training was inadequate. *See id.* at 67 (finding that "it is undisputed . . . that the prosecutors . . . were familiar with the general *Brady* rule").

In sum, Plaintiff cannot sustain a *Monell* claim under a failure to train theory.

### 3.  Failure to Supervise

"In *City of Canton*, the Supreme Court established the 'deliberate indifference' standard in the context of a claim for failure to train, but 'the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims,' including claims for failure to supervise and failure to discipline."  *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) (quoting *Reynolds*, 506 F.3d at 192).

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester Cnty*., No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020) (citation omitted).  Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman*, 2015 WL 1379652 at *21.  To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations . . .  if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari,* 530 F. Supp. 3d at 400.

Plaintiff alleges that "until 2020, the Westchester County District Attorney's Office [] had no system in place to ensure accurate, timely sharing of information regarding uncharged criminal activities by witnesses, or potential deals with witnesses, who testified for the People in criminal cases." (Compl. ¶ 172.)  Plaintiff argues that the "failure to institute appropriate policies, procedures and practices to ensure information-sharing within the office created a substantial risk that *Brady* material would not be disclosed to defense attorneys." (*Id*. ¶ 175.)  Plaintiff further argues that the "pleaded facts support the inference that 'the need for more or better supervision to protect against constitutional violations was obvious' given the number of separate law enforcement agencies within the County, but the WCDAO 'failed to make meaningful efforts to address the risk of harm' that the absence of such a system could cause." (Pl.'s Mem. 18.)  Citing to the Westchester County District Attorney's Annual Report in 2012, Plaintiff argues that the District Attorney knew that "there was a critical need to coordinate information sharing among the 42 police departments and numerous

federal and state law enforcement agencies that operate in Westchester County." (*Id.* at 7.) Plaintiff, however, has not identified a pattern of actual similar constitutional violations that allegedly stemmed from the WCDAO's lack of information sharing system. Indeed, none of the cases that Plaintiff cites to is claimed to have any relation to the lack of information sharing in the WCDAO. Without alleging that there was a pattern of similar *Brady* violations, the failure to institute an information sharing system cannot amount to a failure to supervise. *See Mancuso v. Vill. of Pelham,* No. 15-CV-7895, 2016 WL 5660273, at *10 (S.D.N.Y. Sept. 29, 2016) (holding that the plaintiff failed to plead a failure to supervise when he failed "to allege any prior bad acts like those alleged here that should have put the [municipality] on notice"); *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858944, at *6 (S.D.N.Y. Feb. 29, 2016) (dismissing § 1983 claim in the absence of "any allegations that the [municipality] was on notice of other similar constitutional violations and, in the face of such notice, failed to act"); *Triano*, 895 F. Supp. 2d at 539 (holding that the plaintiff failed to state a claim when the allegations were "insufficient to support an inference that the [municipality] was 'on notice' of misconduct by its [employees], but failed to act, such that the [municipality] exhibited deliberate indifference to the constitutional rights of its citizens").

Next, Plaintiff asserts that ADA Bender—who was a supervising ADA at the time of Plaintiff's trial and the ADA in *DiSimone*—"has been promoted within the office since the *DiSimone* case, and by promoting him, the WCDAO has ratified his 'egregious' *Brady* violations." (Compl. ¶¶ 191–92.) It is unclear whether Plaintiff is asserting that the promotion of ADA Bender amounts to a failure to supervise or discipline and Plaintiff does not allege any other specific instances of attorneys who were promoted after conducting *Brady* violations. A single promotion does not sufficiently allege that a municipality consistently failed to discipline those involved in unconstitutional acts—indeed, cases finding failures to discipline have required

31

much more.  *See Buari*, 530 F. Supp. 3d at 407–08 (ruling that the plaintiff sufficiently alleged

failure to supervise when "in approximately 72 cases where courts had found prosecutorial

misconduct occurred []including the use of and failure to correct false or misleading testimony

and *Brady* violations[], officials could only identify one prosecutor from between 1975 and 1996

who had been disciplined in any respect"); *Marlin v. City of N.Y.*, No. 15-CV-2235, 2016 WL

4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline

claim where officers were not disciplined in over thirty-five percent of substantiated complaints,

which "plausibly suggest[ed] that the City did nothing"); *Tieman*, 2015 WL 1379652, at *19–21

(holding that the plaintiff sufficiently alleged the need for better training or supervision where

the plaintiff listed and detailed nine other complaints raising similar allegations against the same

defendants); *McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL 6645987, at *4–5

(S.D.N.Y. Nov. 21, 2014) (holding that the plaintiff sufficiently alleged the need for better

training or supervision where the plaintiff listed and detailed 17 other complaints over a seven-

year period raising similar allegations against the same defendants); *Bertuglia v. City of N.Y.*,

839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012) (denying a motion to dismiss a deliberate indifference

claim where "[t]he plaintiffs have pleaded that the [c]ity has a longstanding, de facto policy of

never disciplining prosecutors who commit specified types of prosecutorial misconduct and not

otherwise training them to avoid misconduct").

     Accordingly, the County's Motion regarding municipal liability is granted and Plaintiff's

claim is dismissed.  *See Jackson v. Westchester Cty.*, No. 18-CV-7207, 2019 WL 3338020, at *4

(S.D.N.Y. July 25, 2019) (dismissing *Monell* claim where the plaintiff failed to "allege the

existence of any policy, any actions taken or decisions made by any . . . policymaking officials,

any systemic failures to train or supervise, or any practices so widespread that they practically

have the force of law" and failed to "provide any factual details regarding . . . other [purported]

lawsuits and grievances" on similar issues) (collecting cases); *see also McKenzie v. City of*

*Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018) (dismissing

*Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led

to [the] alleged" constitutional deprivation).

### III.   Conclusion

For the foregoing reasons, the County's Motion is granted.  Because this is the first

adjudication of Plaintiff's claims on the merits, Plaintiff's claims are dismissed without

prejudice. If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise

addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of

this Opinion & Order.  Plaintiff is further advised that the amended complaint will completely

replace, not supplement, the instant Complaint. The amended complaint must therefore contain

all of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider. If

Plaintiff fails to timely file an amended complaint, the claims may be dismissed with prejudice.

This Court will hold a conference in this case on June 1, 2023, at 2:30 PM.  The Clerk of

Court is respectfully directed to terminate the pending motion, (Dkt. No. 41).

SO ORDERED.

Dated:    March 24, 2023
          White Plains, New York

_____
          KENNETH M.  KARAS
          United States District Judge